IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
**Elkins**

**JEFFERY L. STANTON,**
as Administrator of the Estate
of Spencer Lee Crumbley,
Deceased,

      Plaintiff,

v.                                               **CIVIL ACTION NO. 2:19-CV-49**
                                                               Judge Bailey

**CORY E. ELLIOTT,**
Trooper First Class,
Individually as Member of the
West Virginia State Police, and
**JAMES J. CORNELIUS,**
Trooper First Class, Individually as
Member of the West Virginia State Police,

      Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pending before this Court is Defendants' Motion for Summary Judgment [Doc. 43] and accompanying Memorandum in Support of Defendants' Motion for Summary Judgment [Doc. 44], filed on December 2, 2020. Plaintiff filed his Opposition to Defendants' Motion for Summary Judgment [Doc. 48] on December 23, 2020. Defendants filed their Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment [Doc. 49] on January 6, 2021. Accordingly, this matter is ripe for consideration. For the reasons more fully articulated herein, this Court will grant the Motion.

## BACKGROUND

This action stems from a Complaint brought by plaintiff Jeffrey L. Stanton as the administrator of the Estate of Spencer Lee Crumbley. [Doc. 1]. The action is based on the fatal shooting of decedent Crumbley by two former members of the West Virginia State Police who were dispatched to investigate a domestic disturbance occurring on decedent Crumbley's property. [Id.].

The aforementioned shooting occurred at 616 Simmons Cemetery Road in Valley Head, West Virginia. See [Doc. 44]. At that property, two houses were situated: an A-frame where decedent Crumbley lived, and a house where decedent Crumbley's son (plaintiff), decedent Crumbley's daughter (Ashley Vazquez), her two young children, and her boyfriend resided. [Id.].

According to Vazquez, decedent Crumbley was "a real bad meth head" who would use drugs "[e]very day if he had it." See [Doc. 44-1]. Further, Vazquez noted that on the date in question, decedent Crumbley was coming down from methamphetamine use, which, in turn, caused him to exhibit violent behavior. [Id.].

Vazquez, her boyfriend, Trooper Elliott, and Trooper Cornelius noted the following sequence of events leading up to the shooting. See [Docs. 44-1, 44-6, 44-11, & 44-12]. Decedent Crumbley had been threatening Vazquez for several days leading up to the shooting on December 17, 2017. When decedent Crumbley learned about frozen piping at the property, he struck Vazquez in the head. See [Doc. 44-1]. Fearing for their safety, Vazquez and her boyfriend decided to take the children and leave decedent Crumbley's property.

2

*See* [Id.; Doc. 44-6]. However, Vazquez was unable to do so because decedent Crumbley had flattened her van's tires and stayed at the property to prevent her from leaving. [Id.]. After an unsuccessful attempt to report decedent Crumbley through a 9-1-1 call, Vazquez sent a text message to her mother asking for help. *See* [Doc. 44-1].

Subsequently, Vazquez's mother and an anonymous friend telephoned law enforcement, and the substance of the callers' reports were relayed to defendants. *See* [Docs. 44-2 & 44-9].[1] Moreover, defendants were already familiar with decedent Crumbley because he had been the subject of a prior visit from a drug eradication task force related to the distribution of methamphetamine. *See* [Doc. 44-10].

As defendants drove towards the subject property in response to the phone calls, plaintiff had snuck off the property to head down the mountain in an attempt to avoid decedent Crumbley and place another call to 9-1-1. *See* [Doc. 44-7]. Notably, the transcript of said call contains the following pertinent conversation:

9-1-1:     Randolph County 911.

Stanton:   Yes this is Jeffrey Stanton[.] I need some assistance up here at Valley Head, at ah 616 Simmons Cemetery Road. My sister and her kids are stuck up in the holl[ow] and my Dad will not let them out.

\* \* \*

---

[1] Documentation within the record indicates that this information revealed several key pieces of information to defendants concerning decedent Crumbley's activity leading up to the shooting, including that decedent Crumbley was "throwing guns around"; had "put his hands on" Vazquez; was "on drugs" and "slap crazy"; and would not let Vazquez get to the phone.

3

9-1-1: What's your name?

Stanton: Jeffrey Stanton . . . And make sure to–make sure they are prepared because he is armed and he is dangerous, and he said if he sees a cop, he will shoot.

9-1-1: Okay, what exactly is going on, Sir?

Stanton: My sister and us was up here for Christmas and I have no clue, he flipped out, he went and flattened our tires last night, and we can't get out from up there. I had to walk clear down here in Valley Head.

9-1-1: Okay, does he have like a history of, like altered mental status?

Stanton: Oh, yeah, he's got a bad history.

9-1-1: Ok, like what, Sir? I need to know what exactly is going on, so I can tell them.

Stanton: Well he has my sister and her kids trapped up there. We was trying to go to the store this morning and he went and flattened the tires on her van so we can't leave.

\* \* \*

9-1-1: Ok, so does your father have any weapons?

Stanton: Yes, he's armed.

9-1-1: Do you know what type of firearms he has?

\* \* \*

4

| | |
|---|---|
| Stanton: | [I'm] not for sure what he's got. But I know he's got–I know he's got weapons. |
| 9-1-1: | Ok. |
| Stanton: | And he done said if he sees a cop come up there, he will shoot. |
| 9-1-1: | Do you know why he's holding them hostage there? |
| Stanton: | He's–he's just flipping out. |
| 9-1-1: | So, do you know if he has any, like mental history? |
| Stanton: | No, huh uh, he just don't like the cops. He don't like authorities–at all. |
| 9-1-1: | Ok, but do you know why he's holding them hostage there? |
| Stanton: | No . . . he's done this numerous times. |

\* \* \*

| | |
|---|---|
| 9-1-1: | What's his name? |
| Stanton: | Spencer Crumbley . . . The man needs help. We're trying to get him to go to a rehab or something, but he won't do it. He refuses any help. |
| 9-1-1: | Is he, like, drinking, or is he on drugs, or what's the situation? |
| Stanton: | He's not drinking. He's not on drugs. I think that's the problem: He ain't got no drugs. |
| 9-1-1: | Do you think he's, like, withdrawing? |
| Stanton: | Yeh, probably so. But, I need some assistance . . . |

\* \* \*

5

> 9-1-1: You just stay right there, and we'll send someone up, ok?
>
> Stanton: Alright. Make sure you send back up, now.

See [Doc. 44-7].

After arriving at the subject property, defendant Elliott retrieved a rifle from the trunk of the police cruiser "to be prepared." See [Doc. 44-3]. Defendant Elliott then approached Vazquez to speak with her. See [Doc. 44-10]. Notably, Vazquez informed defendant Elliott that decedent Crumbley had a handgun inside his A-frame. [Id.]. Moments later, defendant Elliott saw decedent Crumbley exit the A-frame, at which time he began yelling at defendants and threatening to engage in a "shootout." See [Id.; Doc. 44-6].

Defendants asked decedent Crumbley to stop, calm down, allow himself to be frisked, and talk, but decedent Crumbley did not comply. See [Docs. 44-1 & 44-10]. On at least two occasions, Crumbley returned to the A-frame and specifically assured defendants that he was going to retrieve a gun, despite being issued repeated commands and warnings from defendants. See [Id.]. Decedent Crumbley then began to move away from his A-frame toward the other house where Vazquez and her children were hiding, prompting defendants to attempt to intercept. See [Docs. 46-1 & 46-6]. During such time, decedent Crumbley picked up a shovel, swung it and threw it at defendants, then again retreated to his A-frame. [Id.]. As defendants attempted to tackle decedent Crumbley before entering the A-frame, defendant Cornelius slipped in the snow and fell. See [Doc. 44-10]. Defendant Elliott then reached the porch of the A-frame, drew his firearm, and observed decedent Crumbley turn around and reach both hands into the couch on the porch. See [Doc. 44-3]. It was at this moment that

6

defendant Elliott shot decedent Crumbley once in the hand and once in the back. See [Id.]. Defendants then attempted to perform first aid on decedent Crumbley but, ultimately, he died from his injuries. See [Docs. 44-1 & 44-3]. A search of decedent Crumbley and the couch revealed no weapons. [Id.].

## PROCEDURAL HISTORY

Based on the foregoing, Stanton (as the administrator of decedent Crumbley's estate) sued defendants in their individual capacities. See [Doc. 4]. More specifically, Stanton sued defendant Elliott for shooting decedent Crumbley and defendant Cornelius for failing to intervene. [Id.]. Count I is brought pursuant to U.S.C. § 1983 against both defendants for excessive force and failure to intervene. Count II is an analogous claim for violating the West Virginia Constitution. Count III is a state common law claim for battery. Count IV is a common law claim for negligence. See [Id.].

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, the nonmoving party "may not rest upon the mere allegations or denials of its pleading, but must set forth specific facts showing there is a genuine issue for trial."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Additionally, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial. Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 323–25; *Anderson*, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted). Although all justifiable inferences are to be drawn in favor of the non-movant, the non-moving party "cannot create a genuine issue of material fact through mere speculation of the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Further, "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

8

## DISCUSSION

This Court will discuss the applicable legal standard and law with respect to each individual count. Given its particular import in this case, this Court begins with a recitation concerning the doctrine of qualified immunity. Qualified immunity serves to protect:

> government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have know." . . . The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citations omitted) (citing *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (quoting *Butz v. Economou*, 438 U.S. 478, 507 (1978)); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The doctrine affords law enforcement officers "'ample room for mistaken judgements' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Qualified immunity insulates law enforcement officers from "bad guesses in gray areas," ensuring that they are only liable "for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). "This accommodation for reasonable error exists because 'officials should not err always on the side of caution' because they fear being sued." *Hunter*, 502 U.S. at 229. "Where there is a legitimate question as to whether the officer's conduct would objectively violate the plaintiff's right, qualified immunity 'gives police officers the necessary latitude to pursue their [duties] without having to anticipate, on the pain of civil

9

liability, future refinements or clarifications of constitutional law.'" *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991). "A police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information could have believed that his conduct was lawful." *Id.* "This inquiry is a pure question of law and 'hence always capable of decision at the summary judgment state.'" *DiMeglio v. Haines*, 45 F.3d 790, 794 (4th Cir. 1995) (citations omitted).

## I. DEFENDANT ELLIOTT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON COUNT I.

Count I of plaintiff's Amended Complaint alleges a violation of 42 U.S.C. § 1983, which provides that:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ..

See [Doc. 4]. Additionally, plaintiff alleges violations of the Fourth, Fifth, Eight, and Fourteenth Amendments. [Id.]. In response to this count, defendants argue that they are protected by the aforementioned doctrine of qualified immunity. See [Doc. 44]. As identified by defendants, plaintiff does not state with any particularity what sub-provisions of the foregoing amendments were purportedly violated by defendants. Because the Eighth Amendment proscribes cruel and unusual punishment, it is clear that decedent Crumbley's Eight Amendment rights were

not violated here because he was not incarcerated at the time of the incident giving rise to this matter. *See Graham v. Connor*, 490 U.S. 386, 392 n. 6 (1989). To the extent plaintiff cites the Fourteenth Amendment for anything other than a means of incorporating the Fourth Amendment against state actions, Count I's Fourteenth Amendment basis lacks merit as a matter of law as well. *See Spry v. West Virginia*, 2017 WL 440733, at *6 (S.D. W.Va. Feb 1, 2017).

Instead, it appears that Count I states a claim for excessive force under the Fourth Amendment. The Fourth Amendment does not proscribe all force, only "unreasonable" force. *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) ("Claims that law enforcement officers used excessive force when making an arrest 'should be analyzed under the Fourth Amendment and its "reasonableness" standard.'") (citation omitted). "The standard of review is an objective one," and "the question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Id.* (citation omitted). "A reviewing court may not employ 'the 20/20 vision of hindsight' and must make 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'" *Id.* (citations omitted). "The court's focus should be . . . on the fact that officers on the beat are not often afforded the luxury of armchair reflection." *Id.* (citations omitted). In analyzing Fourth Amendment claims, "[w]hat matters is whether the officers acted reasonably upon there ports available to them and whether they undertook an objectively reasonable investigation with respect to that information in light of the exigent circumstances they faced." *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 787 (4th Cir. 1998) (quotations and citations omitted).

11

"[I]n determining objective reasonableness, the court must consider what a 'reasonable officer on the scene' would have done, taking into account such factors as 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* at 786–87 (citations omitted). Importantly, "[t]his evaluation is guided by the pragmatic considerations of the moment and not by those that can be hypothesized from an armchair." *Id.* "In determining the constitutionality of the use of deadly force, a court must decide 'whether the totality of the circumstances justified' the use of deadly force in the particular circumstances of the case before it. But the use of deadly force is justified only in circumstances where it 'it is necessary to prevent the escape [of the suspect] and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Milstead v. Kibler*, 243 F.3d 157, 162–63 (4th Cir. 2001) (citations omitted).

Based on the foregoing body of law, defendants argue that they acted reasonably given the circumstances and are thus entitled to qualified immunity. See [Doc. 44]. In response to this argument, plaintiff asserts several arguments which this Court will discuss in turn. First, plaintiff suggests that the continued vitality of the doctrine of qualified immunity has been questioned in various Courts, and requests this Court to abandon the requirement that liability under § 1983 requires a showing that a clearly established legal standard was violated. See [Doc. 48]. Citing *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985), plaintiff also argues that defendants' actions constituted a violation of a clearly established constitutional standard

12

governing the use of deadly force. See [Doc. 48]. Additionally, plaintiff contends that there is a genuine issue of material fact as to whether defendant Elliot acted reasonably. [Id.].

Initially, this Court is not persuaded by plaintiff's argument that it should deviate from clearly established precedent recognizing the viability of the doctrine of sovereign immunity. Absent some novel, controlling precedent from the United States Court of Appeals for the Fourth Circuit or the Supreme Court of the United States, this Court will not sway from the doctrine's applicability based on plaintiff's public policy argument.

This Court is similarly not persuaded by plaintiff's argument that defendants' actions violated one of decedent Crumbley's clearly established constitutional rights, nor does this Court find that there is a genuine issue of material fact in that regard based on a review of the totality of the record.

Much of plaintiff's argument in this respect centers on the fact that a weapon was never actually found on decedent Crumbley or in the couch. However, the lack of a weapon is of little moment with respect to reasonableness in these circumstances. In *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 788 (4th Cir. 1998), the Fourth Circuit noted:

> Notwithstanding the possibility of a dispute about whether a knife was actually in Sigman's hand at the moment of the shooting, Officer Riddle, and the other officers present, acted on the perception that Sigman had a knife in his hand. Where an officer is faced with a split-second decision in the context of a volatile atmosphere about how to restrain a suspect who is dangerous, who has been recently–and potentially still is–armed and who is coming towards the officer

13

despite officers' commands to halt, we conclude that the officer's decision to fire is not unreasonable.

*Id.* This case is factually analagous to *Sigman*, and it is unmistakably clear from the record that at the time of the shooting, defendants had been told that (1) decedent Crumbley had a gun and was upset; (2) decedent Crumbley was experiencing a "come-down" from methamphetamine; and (3) decedent Crumbley had prevented his family from leaving the property. Additionally, decedent Crumbley had also attacked defendants with a shovel and repeatedly threatened to shoot them.

Given the totality of these circumstances, any objectively reasonable officer could easily have believed that decedent Crumbley presented an immediate threat justifying the use of deadly force. As such, this Court finds that defendant Elliott could have reasonably believed deadly force was required and is thus entitled to qualified immunity. As such, Count I of plaintiff's Amended Complaint, insofar as it pertains to defendant Elliott, must be dismissed as a matter of law.

## II. DEFENDANT CORNELIUS IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON COUNT I.

Plaintiff argues that defendant Cornelius failed to intervene to prevent defendant Elliott from shooting decedent Crumbley. *See* [Doc. 4]. In order to prevail on such a claim, plaintiff must demonstrate that defendant Cornelius: (1) knew that defendant Elliott was violating decedent Crumbley's constitutional rights, (2) had a reasonable opportunity to prevent the harm, and (3) chose not to act. *Randall v. Prince George's Cty., Md.*, 302 F.3d 188, 204 (4th Cir. 2002).

Defendants assert a variety of arguments in support of their argument that Count I should be dismissed insofar as it pertains to defendant Cornelius. Namely, defendants assert that defendant Cornelius could not have known that defendant Elliott was violating decedent Crumbley's constitutional rights.[2] Plaintiff argues in opposition that a genuine issue of material fact exists as to whether defendant Cornelius failed to act reasonably in failing to prevent defendant Elliott from shooting decedent Crumbley. See [Doc. 48]. In support thereof, plaintiff correctly notes that law enforcement officers have a duty to intervene when they see that a fellow officer is using, or about to use, excessive force. See *Randall*, 302 F.3d at 204. However, as articulated above, this Court has found that defendant Elliott's actions were not unreasonable or excessive given the circumstances and, as such, Count I of plaintiff's Amended Complaint, insofar as it pertains to defendant Cornelius, must be dismissed as a matter of law.

## III. DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON COUNT II.

Count II sets forth a West Virginia state-law analog to Count I. However, plaintiff concedes in responsive briefing [Doc. 48] that subsequent to the filing of the Amended Complaint, the Supreme Court of Appeals of West Virginia issued an opinion in which it refused to recognize a private cause of action for monetary damages under Article III, Section 6 of the West Virginia Constitution. See Syl. Pt. 3, *Fields v. Mellinger*, 2020 WL 7223433

---

[2]Because this Court finds this argument dispositive, it dispenses with addressing defendants' remaining arguments concerning this count.

15

(W.Va. 2020). As such, Count II of plaintiff's Amended Complaint must be dismissed as a matter of law with respect to both defendants.

## IV. DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON COUNTS III AND IV.

In Count III, plaintiff alleges a state common law claim for battery. [Doc. 4]. Count IV is a common law claim for negligence. See [Id.]. Defendants assert that both these counts fail to state a claim for which any relief could be granted. See [Doc. 44]. In support thereof, defendants rely on W.Va. Code § 55-7-8a(a), which provides, in part, that "[i]n addition to the causes of action which survive at common law, causes of action for . . . injuries to the person and not resulting in death . . . also shall survive; and such actions may be brought notwithstanding the death of the person entitled to recover or the death of the person liable." See W.Va. Code § 55-7-8a(a). Based on this statutory language, defendants claim that it is well-settled that causes of action for injuries that do result in death do not survive. See [Doc. 44]. With this standard in mind, defendants assert that the alleged battery and negligence caused decedent Crumbley's death and therefore, even if those claims had underlying merit, would not survive. [Id.]; see also **Spry v. West Virginia**, 2017 WL 1483370, at *9 (S.D. W.Va. Apr. 24, 2017) ("The battery claim brought by [Adam Myers's] estate cannot proceed because West Virginia claims for battery do not survive death."); **Hoover v. Trent**, 2008 WL 2992987, at *5 (N.D. W.Va. Aug. 1, 2008) (Keeley, J.) ("Hoover's state claims for assault and battery [and] negligence . . . abate under state law. As already noted, under West Virginia's survival statute only injuries not resulting in death survive. W.Va. Code § 55-7-8a.

Because Hoover's complaint states that her claims resulted in Tomasic's death, they abate . . .").

Plaintiff argues against dismissal of Counts III and IV by asserting that these claims were actually brought pursuant to West Virginia's Wrongful Death Act and thus survive. *See* [Doc. 49]. But this is not what plaintiff has pled with respect to these counts. Plaintiff's only mention of the Wrongful Death Act in the Amended Complaint is located at ¶ 12, and states that:

> "[t]he beneficiaries of the Estate of Spencer Lee Crumbley, his son, Jeffery L. Stanton, his daughter, Ashley Crumbley Vasquez, and such other as may be within the purview of the West Virginia Wrongful Death Act, have suffered losses and are entitled to recover all damages permitted by law within the applicable insurance coverage as a result of the wrongful death of Mr. Crumbley
> . . ..

[Id.]. This language is insufficient to properly plead a cognizable cause of action under the Wrongful Death Act because plaintiff has instead plead common law claims for battery and negligence, which, as identified by defendants, do not survive as causes of action in instances involving death. As such, Counts III and IV must be dismissed as a matter of law with respect to both defendants.

## CONCLUSION

For the reasons contained herein, Defendants' Motion for Summary Judgment **[Doc. 43]** is **GRANTED**, and this matter is **DISMISSED WITH PREJUDICE**. The Clerk is

17

directed to enter judgment in favor defendants and **STRIKE** this matter from the active docket of the Court.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED:** January 21, 2021.

JOHN PRESTON BAILEY
**UNITED STATES DISTRICT JUDGE**