PUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 21-1197

JEFFERY L. STANTON, as Administrator of the Estate of Spencer Lee Crumbley, Deceased,

      Plaintiff - Appellant,

  v.

CORY E. ELLIOTT, Trooper First Class, Individually as Member of the West Virginia State Police; JAMES J. CORNELIUS, Trooper First Class, Individually as Member of the West Virginia State Police,

      Defendants - Appellees.

Appeal from the United States District Court for the Northern District of West Virginia, at Elkins.  John Preston Bailey, District Judge.  (2:19-cv-00049-JPB)

Argued:  October 27, 2021
Decided:  February 1, 2022

Before RICHARDSON and QUATTLEBAUM, Circuit Judges, and Michael F. URBANSKI, Chief United States District Judge for the Western District of Virginia, sitting by designation.

Reversed in part, affirmed in part, and remanded by published opinion.  Judge Richardson wrote the opinion, in which Judge Quattlebaum and Chief District Judge Urbanski joined.

**ARGUED:** James Anthony McKowen, JAMES F. HUMPHREYS & ASSOCIATES, L.C., Charleston, West Virginia, for Appellant.  Michael Deering Mullins, STEPTOE & JOHNSON PLLC, Charleston, West Virginia, for Appellees.  **ON BRIEF:** James F.

Humphreys, JAMES F. HUMPHREYS & ASSOCIATES, LC, Charleston, West Virginia, for Appellant.  Candace Haley Bunn, Robert L. Bailey, STEPTOE & JOHNSON PLLC, Charleston, West Virginia, for Appellees.

RICHARDSON, Circuit Judge:

Spencer Lee Crumbley was shot dead by West Virginia State Trooper Cory Elliott. According to Trooper Elliot, he lost sight of Crumbley during a foot chase. When Trooper Elliott turned a corner, he saw Crumbley turned away from him. Crumbley then abruptly turned toward Trooper Elliott and began to raise his hands, causing Trooper Elliot to believe that he might have a gun. That is when the shooting happened. As it turned out, Crumbley did not have a gun in his hands. But his conduct earlier in the encounter, including threats of violence and erratic behavior, added to the sudden hand movements, may well have been sufficient justification for Trooper Elliott's split-second decision to use deadly force.

But one important detail calls Trooper Elliott's story into question: Crumbley was shot in the back. Based on that detail, Crumbley's son sued for excessive force. If we took Trooper Elliott at his word, his actions may not amount to a constitutional violation at all. But this case arrives here on summary judgment, so we must determine whether there is any genuine dispute about what happened that day. And the shot in the back calls Trooper Elliot's version of events into question. On this record, there is a genuine dispute of fact that might show a violation of a clearly established constitutional right. We thus reverse the district court's grant of qualified immunity.

I.  **Background**

Weeks before the shooting, Crumbley's children came to visit. His daughter, Ashley Vazquez, along with her boyfriend and her two young boys, had come down to West Virginia from Michigan. Jeffery Stanton, Crumbley's son and the plaintiff in this

3

case, was also staying at his father's place.  The Crumbley property sits at the end of a gravel path in rural West Virginia, and it has two buildings on it:  a small A-frame house on one side and a slightly larger cabin about fifty feet away.  Crumbley stayed alone in the A-frame, and his children stayed in the cabin, along with Vazquez's boyfriend and the two grandchildren.  They all planned to help Crumbley by fixing up the property and filling out the forms to get food stamps.

Before the shooting, things had been tense at the Crumbley place.  About a week before he was killed, Crumbley had run his son's girlfriend off the property with a gun.  She had two young children with her, and he had chased them down the road threatening to kill her.  This was not unusual for Crumbley.  In the past Crumbley had apparently sat on the hill above the property with his gun, surveying the land and making sure his kids did not leave without his permission.

But this fatal episode really started when it got cold.  In the days before Crumbley's death, it had gotten so cold that the pipes had frozen.  Crumbley was furious.  Crumbley wanted his kids to solve the problem—they were supposed to be there to help—and berated them when they did not.  After a brief thaw, Crumbley got the water running again.  Out of frustration, he hit his daughter in the head.  He was "hateful" that day, Vazquez told the police.  J.A. 56.  And he stayed up all that night watching the cabin and making sure they could not leave.

That was the day before the shooting.  The next day was cold, and there was snow on the ground.  In the morning, Vazquez wanted to leave to get cigarettes, but the tires on her van were flat.  She was convinced her father had done it to keep them there.  And given

4

the previous day's showdown, she feared a confrontation that morning; she feared "chaos." J.A. 58. It seems Crumbley had been drinking moonshine the night before and was in a foul mood after coming down from meth.

Vazquez began texting her mother about the situation. Vazquez was especially worried because she knew her father had weapons in the A-frame: at least a handgun, maybe a shotgun, and possibly even a sword. Vazquez's boyfriend seemed to think there was a .22 rifle in the A-frame as well. Because there was no cell service to make calls from the property, Vazquez texted her mother and asked her to call 911.

Meanwhile, West Virginia State Troopers Cory Elliott and James Cornelius were at the Elkins State Police communications center. They were just starting their morning when the 911 calls started coming in about Crumbley. All things told, there were three 911 calls that morning about the Crumbley situation. Vazquez's mother called; so did a family friend. They both asked the police to go to the Crumbley place and diffuse the situation. They told the dispatcher that Crumbley was armed and dangerous and keeping his family hostage. Stanton also made a call to 911.[1] He had walked down off the property to get cell service, and he hid this small betrayal from his father, who Stanton knew would react badly to it. On the 911 call, Stanton said that his sister and her kids were trapped, that there

---

[1] The three 911 calls came in to two places. There is a Randolph County 911 line and a line that goes to the West Virginia State Police detachment in Elkins. The troopers were attached to the State Police line in Elkins, and that is where the mother's and friend's calls went. Stanton called the County 911 line, and while that call was not directed to the State Police, the County relayed the information from that call to the troopers over the radio.

5

were weapons, and that Crumbley was armed and dangerous.² Stanton told the 911 dispatchers to tell the troopers what Vazquez later confirmed on the scene: Be careful because Crumbley often made threats about shooting the police.

With this information from the 911 calls, the troopers sped over with sirens on. On the way, the troopers discussed Crumbley's rumored drug connections. The troopers had heard Crumbley's name in connection with drugs like marijuana and methamphetamine. And after the shooting, Vazquez confirmed these rumors, recounting that her father was "a real bad meth head," who was the "devil" when he was coming off a meth high, as he was on the day he was shot. J.A. 57, 60; *see also* J.A. 188 (post-mortem toxicology report finding meth in Crumbley's system).

The troopers arrived mid-morning, and Crumbley would be shot less than twenty minutes later. There is no audio or video footage of anything that happened; the troopers did not have bodycams. Once there, Trooper Cornelius went up to the cabin and met Vazquez, while Trooper Elliott stayed down by the cruiser to watch for Crumbley. Vazquez confirmed that her father was somewhere on the property, possibly with a weapon, that he had hit her before, that there was a handgun in the house, and that he had flattened their tires and threatened them. Trooper Cornelius told Vazquez to lock the cabin

---

² During a deposition almost three years later, Stanton denied ever telling anyone that his father was armed and dangerous, even though he is recorded saying as much on the 911 call. *See* J.A. 454 ("And make sure . . . they are prepared because he is armed and he is dangerous, and he said if he sees a cop, he will shoot."). Stanton also met with the troopers at a nearby church before they went to Crumbley's property. The troopers say that Stanton confirmed during that meeting that Crumbley was potentially armed and dangerous. But Stanton again denies he said anything of the sort. Stanton then left the scene and hitchhiked to visit his kids in a nearby town, not to return until after the shooting.

doors and to keep everyone inside. Cornelius came back to the cruiser to tell Trooper Elliott what was said.

When Cornelius returned to the cruiser, Crumbley came out of the A-frame house screaming. He demanded that the troopers get off his property and threatened a shootout. He had nothing in his hands yet but threatened to get a weapon from the house. After first appearing, Crumbley went back and forth several times between the yard where the troopers were and the A-frame house, each time threatening to get a weapon and shoot the troopers. And all the while, the troopers were telling Crumbley to put his hands up, calm down, and come over to them. At one point, Crumbley lifted up his shirt and pulled down his pants to expose his genitals while spinning in a circle.

But things really boiled over when Crumbley got hold of a shovel. He threatened the troopers with it and then, with the shovel in hand, tried to get into the locked cabin where Vazquez and her family were hiding. After failing to get into the cabin, Crumbley turned to see the troopers approaching, and he started swinging the shovel at them. The troopers backed off, and Crumbley ran. As the troopers gave chase, Crumbley threw the shovel. Trooper Cornelius slipped on the snow and fell. Trooper Elliott kept chasing. Crumbley ran around the right side of the A-frame, and Trooper Elliott lost sight of him for a second or two. That's when Trooper Elliott took out his service pistol. Then, Trooper Elliott turned the corner.

The only testimony we have of what happened next is Trooper Elliott's. He says that he "took the corner just a little bit wide" and then saw Crumbley just slightly to his left. J.A. 85–86. Crumbley was standing still, facing the near end of a couch that was set

7

up there along the house. Trooper Elliott saw the wall of the house on his left, with the couch set up parallel to it, and Crumbley facing the couch and the wall, meaning that Crumbley was turned about 90 degrees away from Trooper Elliott with his left side facing Trooper Elliott. At that moment, they were about seven or eight yards apart.

Trooper Elliott could not tell what Crumbley was doing at the couch, maybe reaching for something, maybe just "bent over in the couch," but whatever it was, it ended when Crumbley abruptly turned toward Trooper Elliott and began to raise his hands. J.A. 86. That's when Trooper Elliott fired, five shots, without stopping, all in a few seconds, at the same moment Crumbley's hands came up. He shot because he thought his life was in danger as Crumbley might have found a gun after all his threats to go get one.

Trooper Elliott aimed for center mass, and Crumbley was hit two times: once in the back of his right hand and once in the back, inside his right shoulder blade.[3] It is not clear which shot hit first. Trooper Elliott later testified that the reason he hit Crumbley in the back was that Crumbley had continued to turn as he was shot. So on Trooper Elliot's version of the story, Crumbley turned left to see him as the hands came up and continued turning left as the shots rained down on him, which is one explanation for the shot in the right side of Crumbley's back.

---

[3] The shot to the back was 18.75 inches below the top of the head and 6.25 inches to the right of the midline of the back, which makes it about where the right shoulder blade is. The bullet then went through two ribs, punctured the lung, the diaphragm, the left liver, and ended up lodged in the tissue of the left side of his body. The path of the bullet was from back to front, right to left, and down. The shot in the hand was 2.5 inches below the right wrist and in the back of the hand. The path of that bullet was back to front, left to right, and up, and it exited the front of his hand between the thumb and forefinger.

8

After the shooting, the troopers called for medical assistance and unsuccessfully tried to save Crumbley by putting pressure on the wound. He died from the wound to the back. After it was over, the troopers searched the couch and the surrounding area for a gun but found nothing. Two bullets were found, one lodged in Crumbley, another in the ground near the couch; the other three were not recovered.

Stanton, as administrator of his father's estate, sued the troopers in the United States District Court for the Northern District of West Virginia. The Complaint included four counts: (1) a 42 U.S.C. § 1983 claim for excessive force; (2) a similar claim under the West Virginia Constitution;[4] (3) a claim called "Battery"; and (4) a claim called "Negligence and/or Recklessness." The troopers moved for summary judgment in December 2020, and the district court granted their motion on all counts a month later. We have jurisdiction under 28 U.S.C. § 1291.

## II. Discussion

### A. Federal Qualified Immunity

#### 1. Legal Standards

Stanton brings an excessive-force claim under the Fourth Amendment. In such cases, we use an objective reasonableness test to determine whether excessive force was used. *Elliott v. Leavitt*, 99 F.3d 640, 642–43 (4th Cir. 1996) (first citing *Graham v. Connor*, 490 U.S. 386, 396 (1989); and then *Tennessee v. Garner*, 471 U.S. 1 (1985)). When *deadly*

---

[4] This claim has since been foreclosed by the West Virginia Supreme Court decision *Fields v. Mellinger*, 851 S.E.2d 789, 799 (W. Va. 2020), which held that there is no private right of action for violating the relevant portion of the West Virginia Constitution.

force is used, we have a more specific test for objective reasonableness. In those cases, we consider whether the hypothetical reasonable officer in that situation would have had "probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others." *Waterman v. Batton*, 393 F.3d 471, 477 (4th Cir. 2005) (quoting *Garner*, 471 U.S. at 11). That determination must focus on the moment that deadly force was used, not the whole episode. *Elliott*, 99 F.3d at 643. And the justification for deadly force can fall away in seconds. *Waterman*, 393 F.3d at 481. In questioning the split-second decisions of police officers, we must avoid hindsight bias and try to place ourselves in the heat of the moment. *Elliott*, 99 F.3d at 642.

That is the substantive law. Then, we view that excessive-force claim through the lens of the affirmative defense of qualified immunity. When a qualified-immunity defense is raised, we apply a two-step test. We must determine, first, whether the facts viewed in Stanton's favor make out a violation of his father's constitutional rights, and second, whether that violated right was clearly established at the time. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

In the Fourth Circuit, we have a split burden of proof for the qualified-immunity defense. The plaintiff bears the burden on the first prong, and the officer bears the burden on the second prong. *See Henry v. Purnell*, 501 F.3d 374, 377–78 & n.4 (4th Cir. 2007).[5]

---

[5] Who bears the burden on qualified immunity turns out to be a surprisingly tricky question. Because qualified immunity is a two-prong test and because there are two sides to a lawsuit, there are four possible ways to split the burdens: (1) the plaintiff might have the burden on both prongs; (2) the officer might have the burden on both prongs; (3) the plaintiff might have the first prong and the officer the second; or (4) vice versa. While (Continued)

And finally, this is summary judgment where our review is de novo. *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019). We view the evidence in the light most favorable to the plaintiff; we draw all reasonable inferences in his favor; and we do not weigh the evidence or make credibility calls, even if we do not believe he will win at trial. *Id.* Once all that is done, we can only grant summary judgment where no material facts

---

most circuits apply the first or second options above, all four possibilities have been put forth by at least one circuit in at least one opinion. *See Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 329–30 & n.19 (5th Cir. 2020) (citing Kenneth Duvall, *Burdens of Proof and Qualified Immunity*, 37 S. Ill. U. L.J. 135, 145 (2012) (collecting cases going in each direction)). You might even imagine further splintering, where the burdens of production and persuasion that make up our burden of proof are mixed and matched on each prong.

The Fourth Circuit split burden for qualified immunity comes from a winding road. *See Henry*, 501 F.3d at 377–78 & n.4. Perhaps because of the historical development of the defense from good-faith immunity to qualified immunity, or perhaps from the splitting of the defense into a two-step inquiry, *see Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson*, 555 U.S. at 236, a messy intra-circuit split over the burden in qualified-immunity cases developed. The first case in the Fourth Circuit to explicitly decide the burden on both parts of the defense after the split in *Saucier* was *Henry v. Purnell*, 501 F.3d at 377; *cf. Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003) (discussing the burden in general without applying it to each prong). In *Henry*, we announced our new split-burden standard by citing both sides of the intra-circuit split that existed pre-*Saucier*. First, *Henry* cited *Bryant v. Muth*, 994 F.2d 1082, 1086 (4th Cir. 1993), which purported to put the whole burden of the pre-*Saucier* defense on the plaintiff, for the proposition that the plaintiff bears the burden on the first prong of qualified immunity. 501 F.3d at 377 (citing also *Carr v. Deeds*, 453 F.3d 593, 608 (4th Cir. 2006)). Second, *Henry* cited *Logan v. Shealy*, 660 F.2d 1007, 1014 (4th Cir. 1981), which put the whole burden of the pre-*Saucier* defense on the defendant, for the proposition that the defendant bears the burden on the second prong. 501 F.3d at 377 (citing also *Wilson*, 337 F.3d at 397). *Henry* may have forged a rough compromise, but it was the first case to opine about both prongs.

Some Fourth Circuit cases suggest that the full burden of proving qualified immunity rests on the party invoking it. *See, e.g.*, *Meyers v. Balt. Cnty.*, 713 F.3d 723, 731 (4th Cir. 2013) (citing *Wilson*, 337 F.3d at 397). But *Henry* is the case that binds us here as the earliest case that decides this precise issue. *McMellon v. United States*, 387 F.3d 329, 332–34 (4th Cir. 2004) (en banc).

11

are genuinely disputed, and the troopers are entitled to win as a matter of law. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

With deadly force cases, special difficulties can arise during summary judgment. Often, the officer has killed the only other potential witness. Courts should be careful at summary judgment to avoid simply accepting an officer's self-serving statements and must consider all contradictory evidence. *See Ingle ex rel. Est. of Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir. 2006); *see also Brown ex rel. Lawhorn v. Elliott*, 876 F.3d 637, 641 (4th Cir. 2017) (emphasizing "the importance of drawing inferences in favor of the nonmovant, even when . . . a court decides only the clearly-established prong" (quoting *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014))). Speculation alone cannot create a factual dispute. *Elliott*, 99 F.3d at 644–45 (requiring "specific, material factual contentions"). But in these cases, it would be easy to overvalue the narrative testimony of an officer and to undervalue potentially contradictory physical evidence. *See, e.g.*, *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) ("[T]he judge must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify."). So we should be cautious to avoid simply accepting officer testimony as true. *See Abraham v. Raso*, 183 F.3d 279, 294 (3d Cir. 1999). But neither does caution lead us to be especially critical of officer testimony in these cases. We need only apply our normal summary-judgment rules, which ask whether reasonable juries might disagree over some material factual dispute. *See Harris*, 927 F.3d at 276 (suggesting that exculpatory officer statements "do not justify a departure from the normal summary judgment standard"); *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994).

12

In sum then, we must consider whether there are any material disputes of fact left in this record that, when resolved, would amount to the violation of a clearly established constitutional right. If there are, summary judgment is inappropriate.

**2.    Analysis**

We begin with the story as Trooper Elliott tells it. If we take him at his word, we may not find a constitutional violation at all, let alone a clearly established one. A police officer need not wait for a suspect to shoot before using deadly force. *Elliott*, 99 F.3d at 643. And an officer need not see the weapon in a suspect's hands to find him objectively dangerous. *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 787–88 (4th Cir. 1998). So if the question before us was whether—given the split-second nature of the decision—Trooper Elliott reasonably believed that Crumbley might have a weapon and might shoot, then we may well find qualified immunity. Crumbley was erratic that day; he had threatened to shoot the troopers multiple times; he had swung a shovel at the troopers; and the troopers knew that Crumbley had a gun on the property and was inclined to use it. With all that as context, Elliott may have made an objectively reasonable decision to react with deadly force to Crumbley's abrupt hand movements.[6]

---

[6] Stanton makes two arguments that there is a violation even on this story, but neither is convincing. First, he says that it was wrong for the troopers to fail to use non-lethal measures like pepper spray to restrain Crumbley earlier in the encounter. This theory is cleanly cut off by our precedent, which limits our consideration to the moment when deadly force was used. *Henry*, 652 F.3d at 531; *Elliott*, 99 F.3d at 643. Whether the troopers might have done something better earlier in the encounter is not relevant here. Second, Stanton suggests that it was a violation not to give a warning before shooting. While a warning must be given before deadly force when feasible, it is not feasible to give a warning when there is an immediately threatened danger. *Hensley ex rel. N.C. v. Price*, (Continued)

But we cannot simply accept the trooper's statements as true given potentially contradictory physical evidence, *see Ingle*, 439 F.3d at 195, and Elliot's testimony here is at least in tension with some other evidence. So we must determine whether a jury might reasonably reject the officer's testimony at trial considering that evidence.

Start with the obvious: Crumbley was shot in the back. Trooper Elliott says he started shooting when Crumbley turned toward him and began to raise his hands, and that the shot in the back must have happened because Crumbley continued to turn as the shooting went on. The shot in the back does not out-and-out refute that story, *cf. Scott v. Harris*, 550 U.S. 372, 378 (2007), but it does draw it into question. Another explanation of that fact is that Trooper Elliott shot Crumbley while his back was turned. *See Samples ex rel. Samples v. City of Atlanta*, 846 F.2d 1328, 1332–33 (11th Cir. 1988) (suggesting that a shot in the back can create a fact question where the main defense theory was based on the-bullets-must-have-spun-him testimony from the officer).

The shot in the hand also complicates Trooper Elliott's narrative. He says that Crumbley was shot while turning from right to left and raising his hands. And we know from the autopsy report that one of the bullets went through the back of his right hand. If both those things are true, it is hard to conceive of a variation of events where Crumbley was hit before turning his back. If Crumbley's hands came up with palms out, then

---

876 F.3d 573, 584 (4th Cir. 2017). Because the potential danger was, on Trooper Elliott's account, seemingly immediate—Crumbley was right there raising his hands, perhaps with a gun—the failure to warn would not be a constitutional violation. Anyway, the troopers gave Crumbley many warnings throughout the interaction: to stop, to calm down, to raise his hands, and that lethal force might be used if he failed to comply.

14

Crumbley would have to be turned away from Trooper Elliott to be shot in the back of the right hand. Alternatively, we might imagine that Crumbley was hit in the back of his right hand while his hands were down or were only just coming up, which would explain how he was shot while facing Trooper Elliott. Trooper Cornelius said in his deposition that Trooper Elliot initially told him that the shot in the hand came first and that Crumbley turned before being hit in the back. But if he was shot in the back of his right hand while facing Trooper Elliott, it would be strange for him to continue turning to his left against the momentum of the gunshot to then be hit again in the right side of his back. If instead he turned with the momentum, it would have taken quite a turn to get back around so that the right side of his back could be hit by the second bullet. We could go on with other variations; surely there are others. But the point is that Trooper Elliott's story is not unquestionably true given the placement of the wounds. So a reasonable jury, even without expert testimony, might consider these questions and determine that not just one but two shots struck the victim while his back was turned.

      We also know that nothing was found in the couch—not drugs, not a gun, nothing. And the couch lacked cushions to hide anything in. Why stop at that couch if there is nothing in it? That is not much, especially given Crumbley's erratic behavior that day, but perhaps it undermines, at least a little, Trooper Elliott's claim that Crumbley stopped at the couch. Trooper Elliott also missed three of his five shots. That too may not tell us much, given the foot chase and the distance between him and Crumbley—we do not expect perfect marksmanship—but it is some small piece of evidence drawing Trooper Elliot's account in question because it is harder to shoot a moving target. All this physical evidence

15

may not necessarily refute Trooper Elliott's story, but it might be reasonably arranged by a jury into a different version of events that does.

Beyond the physical evidence, a reasonable jury's doubt based on the physical evidence might find support in possible inconsistencies and omissions in Trooper Elliott's story. In a use-of-force statement given around 2:30 PM on the day of the shooting, Trooper Elliott provided no real detail about what happened. He "fired his West Virginia State Police issued duty pistol, striking Mr. Crumbley." J.A. 371. Trooper Elliot did not mention that Crumbley was shot in the back. That detail seems important enough to mention. And based on his deposition, we have reason to believe that Trooper Elliott knew he shot Crumbley in the back. He said that he put pressure on Crumbley's wound after the shooting, and we know from the autopsy that the shot entered the back and that there was no exit wound.

When asked about the shooting during his deposition, Trooper Elliott first described aiming at "center mass" on Crumbley but then acknowledged that the shots hit him "in his right hand, and I believe it was his right side." J.A. 306. Later, when Trooper Elliott was asked which wound he put pressure on, he answered: "The one to his side." J.A. 308. Describing the wound as being to Crumbley's "side" diverges from the physical facts in the autopsy report, which describe a gunshot to the back, inside the shoulder blade, not an area that is naturally described as the "side." J.A. 383. And if he did indeed put pressure on the wound as he said, he would have known the shot was to the back and not the side.

On the issue of how Crumbley was shot in the back if the shots were aimed at "center mass," Trooper Elliott had this to say: "I believe he was turning and his momentum carried

16

him, and that's—if he was turning and—and got, you know, hit and just kept turning, I believe." J.A. 307.  It was only when pressed on the disparity between the shot in the back and the center-mass story that Trooper Elliott mentioned that Crumbley turned as he fell, another detail that might have been offered earlier on.  None of these inconsistencies or omissions are necessarily damning—a reasonable jury might make nothing of them at all and embrace Trooper Elliott as credible and his story as *the* story.  But that same jury might also consider his story alongside the physical evidence and conclude that a different version of events took place.

Taken as a whole, the totality of the evidence presented here creates a genuine fact question about whether Elliot's story is true or whether Crumbley was shot while running away.  And if the jury finds that Crumbley was shot in the back while unarmed and running away, that would violate his clearly established rights.  *Garner*, 471 U.S. at 11; *Graham*, 490 U.S. at 394–95; *Henry*, 652 F.3d at 531–32 ("A police officer who shoots a fleeing suspect without 'probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others' violates that suspect's Fourth Amendment rights." (quoting *Garner*, 471 U.S. at 3)); *see also Rhoades ex rel. Rhoades v. Cnty. Comm'n*, No. 1:18-CV-186, 2020 WL 807528, at *3 (N.D. W. Va. Feb. 18, 2020).  That is enough to defeat qualified immunity, at least at this point.[7]

---

[7] Stanton also tried to create a factual dispute by testifying that he had a family friend named Lou who saw Trooper Elliott shoot Crumbley in the back.  But such inadmissible hearsay cannot create a factual dispute.  *Md. Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991); *see also Harris,* 927 F.3d at 274 n.2; Fed. R. Civ. P. 56(c)(4).  It is telling that Lou was never tracked down to testify.  But (Continued)

17

Because there is a genuine dispute of fact here that might prove a violation of a clearly established right, there cannot be summary judgment on qualified immunity for Trooper Elliott. We do not suggest that Stanton should win this case, only that the district court erred in granting summary judgment.

### 3.   Other Issues

There are a few remaining issues to tidy up. First, the district court rightly questioned whether Trooper Cornelius could be held liable as a mere bystander. For a bystanding officer to be liable for his partner's actions, he must: (1) be "confronted" with the illegal acts, (2) be able to stop them, and (3) do nothing. *See Randall v. Prince George's Cnty.*, 302 F.3d 188, 203–04 (4th Cir. 2002). It is undisputed that Trooper Cornelius slipped in the snow and that the shooting happened out of his sight, so it is hard to see how there is a real question of fact on bystander liability. But we need not go any further because during oral argument Stanton's counsel expressly withdrew his bystander-liability claims against Trooper Cornelius. So we affirm the dismissal of the claims against Trooper Cornelius.

Next, Stanton asks us to "either recalibrate or abolish" qualified immunity. This request is, of course, beyond our say-so. Suffice to say that qualified immunity is "controversial, contested, and *binding*." *Dean ex rel. Harkness v. McBride*, 976 F.3d 407, 422 (4th Cir. 2020) (Richardson, J., dissenting).

---

even if there really is a friend named Lou out there, Stanton's account of what Lou said he saw could not be considered at summary judgment.

18

Finally, Stanton's state-law claims were dismissed because, according to the district court, he failed to properly plead those claims under the West Virginia Wrongful Death Act, W. Va. Code § 55-7-5 to -7. The district court was too harsh; complaints do not have to be so precise. The Federal Rules of Civil Procedure "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (holding that § 1983 need not be specifically invoked to get damages for constitutional rights violations under § 1983). "Pleadings must be construed so as to do justice." Fed. R. Civ. P. 8(e). Factual plausibility pleading requires a higher standard, but for legal misstatements we are more forgiving. *See Johnson*, 574 U.S. at 12. Plaintiffs need not put a claim under a special heading, quote the statute, or use magic words to make out a claim. Courts should focus on the substance of the allegations to avoid making pleading a formalistic headache. *See Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 418 (4th Cir. 2014) (citing *Segal v. Fifth Third Bank, N.A.*, 581 F.3d 305, 310 (6th Cir. 2009)).

Stanton has made plausible allegations meeting the required showing under the Wrongful Death Act, even if he has put those allegations under the wrong headings. *See Bradshaw v. Soulsby*, 558 S.E.2d 681, 685 (W. Va. 2001); *see also Union Carbide Corp. v. Goett ex rel. Est. of Goett*, 278 F.2d 319, 321 (4th Cir. 1960). Stanton cited the Wrongful Death Act in the Complaint—albeit only once and not within each Count—and Stanton makes allegations that naturally fit Wrongful Death Act claims. Indeed, the whole point of the suit is that Trooper Elliott's wrongful actions killed Crumbley. That is enough to give "fair notice of the nature and basis or grounds of the claim and a general indication of

19

the type of litigation involved," and that is what is required to survive dismissal. *Labram v. Havel*, 43 F.3d 918, 920 (4th Cir. 1995) (quoting *Burlington Indus., Inc. v. Milliken & Co.*, 690 F.2d 380, 390 (4th Cir. 1982)).[8] So the state-law claims against Trooper Elliott must also be remanded for further proceedings.

*       *       *

Trooper Elliot tells a story that, if true, may not amount to a constitutional violation. Crumbley was unpredictable that day, and he was loudly threatening to shoot the troopers. He said he had a gun somewhere. So it was reasonable for Trooper Elliott to expect violence when Crumbley had abruptly began to raise his hands after losing the troopers for long enough to have gotten hold of a weapon. But the evidence here, especially the shot in the back, suggests another possible story, a story where there is no turn, there is no abrupt hand movement, and where a fleeing, unarmed man was shot in the back. The evidence here is enough to present a genuine dispute of material fact, and if a jury looks at this record, hears this testimony, and finds that Crumbley was indeed shot in the back while unarmed and running away, that would violate a clearly established right. So granting summary judgment on qualified immunity was improper. Accordingly, the district court's judgment is

REVERSED IN PART,<br>AFFIRMED IN PART,<br>AND REMANDED.

---

[8] There may be an issue of West Virginia State qualified immunity for the Wrongful Death Act claims, *see W. Va. Reg'l Jail & Corr. Facility Auth. v. Est. of Grove*, 852 S.E.2d 773, 782–84 (W. Va. 2020), but we decline to resolve that question here, as it was not addressed by either party.